AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| | ) | Case No.     **23mr600** |
| 1812 Del Norte Dr. SW, Albuquerque, NM 87105 | ) | |
| and | ) | |
| 324 General Chennault St. NE, Albuquerque, NM 87123 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, attached hereto and incorporated herein by reference.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Distribution and possession with intent to distribute controlled substances and |
| 18 U.S.C. §§ 922(g)(1) and 924 | conspiracy thereto; Possession of a firearm and ammunition by a convicted felon; |
| 18 U.S.C. § 924(c | and Possession of a firearm in furtherance of a drug trafficking crime |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Jordan Spaeth, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__subscribed electronically and sworn telephonically__ *(specify reliable electronic means).*

Date:     03/16/2023

City and state:   Albuquerque, New Mexico

_____
*Judge's signature*

Karen B. Molzen, United States Magistrate Judge
_____
*Printed name and title*

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

### INTRODUCTION

1.      I, Jordan Spaeth, Special Agent of the Federal Bureau of Investigation ("FBI"), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residences of **Jerry BEZIE, aka: "Gizmo,"** ("BEZIE"), located at **1812 Del Norte Drive SW, Albuquerque, NM 87105,** (Subject Premises 1) and **Julian LEYBA, aka: "Rail,"** ("LEYBA") located at **324 General Chennault Street NE, Albuquerque, NM 87123,** (Subject Premises 2) (Collectively referred to hereinafter as the "Subject Premises"):

2.      I am requesting a warrant to search the Subject Premises for the items listed in Attachment B, which has been attached hereto and incorporated herein by reference.

3.      A more detailed description and photographs of the Subject Premises are contained within Attachment A, which has been attached hereto and incorporated herein by reference.

### PURPOSE OF THE AFFIDAVIT

4.      Within the last several months, the FBI's Violent Gang Task Force ("VGTF") received information that suspected Thugs Causing Kaos or True City Kings ("TCK") gang members BEZIE and LEYBA are distributing firearms and fentanyl in the Albuquerque area.

5.      Based on the facts and information contained herein, I believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of:

   a.  21 U.S.C. §§ 841(a)(1) and 846 distribution and possession with intent to distribute controlled substances and conspiracy thereto;

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

    b.    18 U.S.C. §§ 922(g)(1) and 924 possession of a firearm and ammunition by a convicted felon; and

    c.    18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime (hereinafter referred to as the "Target Offenses").

6.    This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in this matter; however, the affidavit sets forth only the facts that support probable cause to search the Subject Premises as relevant background information. All figures, times, and calculations set forth herein are approximate.

## TRAINING AND EXPERIENCE

7.    I am a special agent with the FBI and am a law enforcement officer of the United States, within the meaning of Rule 41 of the Federal Rule of Criminal Procedure. I have been a sworn law enforcement officer for more than 14 years, serving as a police officer and FBI special agent. I have been an FBI special agent since 2018 and am currently assigned to the FBI's field office in Albuquerque, New Mexico ("NM") to the VGTF. As a member of the VGTF, my primary responsibility is to investigate criminal enterprises involving violent gang members and their associates who participate in murders, violations of the Controlled Substances Act, firearms violations, racketeering, and other violations of federal law.

8.    Before being assigned to the VGTF, I was assigned to the Violent Crime Task Force ("VCTF") and also investigated felony crimes in Indian Country. During my time on the VCTF I investigated violent repeat offenders, the "worst of the worst" in the Albuquerque area, who participated in crimes such as commercial store robberies, carjackings, bank robberies, interstate threats, violations of federal firearm laws and the

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

Controlled Substances Act. I also investigated violent felonies which were committed on the various Indian Reservations and Pueblos surrounding Albuquerque, which included crimes such as murder, aggravated assault with a deadly weapon, rape, and use of a firearm while in the commission of a violent crime.

9.      My investigative training and experience includes, but is not limited to, reviewing and analyzing phone records, interviewing subjects, targets, and witnesses, writing affidavits for, and executing search and arrest warrants, collecting evidence, conducting surveillance, and analyzing public and financial records. I have conducted hundreds of hours of surveillance on subjects, gang members, and associates suspected of, charged with, and/or convicted of violations of the federal law to include violations of the Target Offenses. Over the course of my career, I have arrested several hundreds of persons for offenses including, but not limited to, murder, armed robberies, firearm violations, bank robberies, illegal narcotics possession and distribution, racketeering, and aggravated assault. I have also been responsible for serving subpoenas and supervising cooperating sources and undercover agents.

10.     For the past three years, I have been the government's lead case agent in the investigation of the Brew Town Locos ("BTL") gang. Over the course of that investigation, more than 40 BTL members and associates have been arrested. I have interviewed several dozen  members, including leadership and associates; executed dozens of search warrants on members, associates, sources of supply, residences, and property for evidence of racketeering, murder, violations of the Controlled Substances Act, and federal firearms violations; seized more than $430k, a considerable amount of stolen property, and more than 90 firearms and distribution quantities of controlled substances.

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

11.     Based on my experience, I am aware gang/criminal enterprises and drug traffickers utilize cellular telephones to exchange information, photographs, and felonious communications, to include the names and locations of informants, witnesses, and victims. I have also observed gang members discuss the acquisition and distribution of controlled substances and firearms to and from other members, as well as discussions about gang related assaults.

12.     I know from my training and experience investigating criminal gangs and drug trafficking organizations that cellular telephones contain evidence of criminal conduct. More specifically, it has been my experience that cellular telephones are utilized to communicate drug prices, availability, quantity, and the contact information for customers and suppliers. I have also discovered photographs of controlled substances and firearms on cell phones.

13.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

14.     Based upon my training, experience, and participation in the instant investigation, as well as the investigation of other gang/criminal enterprises and drug trafficking organizations ("DTO"), I am aware of the following information:

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

a. Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends, or associates, in their business locations, or in stash houses. This documentary evidence includes telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

b. Through my training and experience, I am familiar with the methods and means used by individuals engaged in the type of criminal conduct constituting the Target Offenses to purchase, transport, store, and distribute controlled substances and firearms. I am also familiar with how those individuals and organizations hide the substantial profits generated from their criminal activities. I am aware that those individuals conceal firearms on their person as well as evidence of their drug trafficking, to include illegal narcotics and large amounts of United States Currency.

c. I know that firearms are tools of the trade and instrumentalities of the type of criminal conduct constituting the Target Offenses particularly in instances involving subjects who have committed prior violent crimes and/or firearms

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

violations. It has been my experience that criminals who illegally possess firearms often do not part with such firearms, as it may be difficult for criminals to acquire them. I know that gang members often possess firearms on or near their person, in their vehicles and residences. I know that individuals who are prohibited from possessing firearms know they are not allowed to possess those firearms, therefore they will secrete those firearms within their vehicles, outbuildings, or residences.

d.   It has been my experience that individuals engaged in the type of criminal conduct constituting the Target Offenses possess firearms to facilitate their illegal activities. I am aware that members of DTO's and gang members often possess firearms to protect the often substantial profits from selling narcotics. I have learned that gang members possess firearms to threaten and assault others in an effort to establish their gang as powerful and successful. Also, I have learned that gang members possess firearms and body armor so they can successfully rob other gang members/drug traffickers of their money and/or drugs, and/or to protect themselves from other gang members and drug traffickers, who may try to assault, kill, or rob them.

e.   I know that members and associates of gang/criminal enterprises and DTOs often make substantial profits from their drug trafficking ventures. Often times, individuals engaged in drug trafficking do not deposit their profits into the bank so as to avoid detention by law enforcement. I know that individuals engaged in drug trafficking often keep large amounts of United States Currency at their residence, sometimes hidden or buried. Along with United

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

States Currency, I know that members engaged in drug trafficking may purchase expensive jewelry with their drug proceeds to avoid detection. Therefore, I know that members engaged in drug trafficking may have expensive jewelry which is the result of their drug trafficking operations.

f. Individuals engaged in the type of criminal conduct constituting the Target Offenses are weary of law enforcement surveillance as well as other criminals who would steal their drugs or drug trafficking proceeds. Therefore, I know individuals engaged in drug trafficking use surreptitious and overt video and audio recording devices at their residences, store video and audio recordings in hard drives or other electronic storage devices and have real-time access to video and audio surveillance via applications on their smartphones.

g. I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I have observed incarcerated members of gang/criminal enterprises utilize non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood institutional gang investigators will monitor the

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

call. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement.

h.   In addition, I am also familiar with the use of text messaging, instant messaging, social media, and other messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities.

i.   I have learned individuals involved in the type of criminal conduct constituting the Target Offense often conceal evidence of their drug trafficking activities on their person or in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports, and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. Such evidence includes controlled substances, packaging materials such as baggies, rubber bands, shrink wrap, heat sealers, and drug presses, and other drug use and trafficking paraphernalia, such as pipes and scales.

j.   It has been my experience that members of gang/criminal enterprises and DTOs often maintain records of their transactions in a similar manner to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

payable, and the names and phone numbers of suppliers, customers, and co-conspirators. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, in either hard copy or electronic form. I have personally been involved in search warrants which resulted in the discovery of such records that were more than a year old.

k.   I have learned individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

**ELECTRONIC MEDIA AND FORENSIC ANALYSIS**

15.   As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the Subject Premises, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media. For this reason, I submit that if a computer, digital medium, or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

16.     *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software,

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

   c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

17.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

18.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.   As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

(1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

### The Confidential Human Sources Utilized in the Investigation

19.     During the course of this investigation, FBI case agents utilized several Confidential Human Sources[1] ("CHS" for singular and plural reference) to infiltrate and report on the activities of the Target Subjects. Four CHS were utilized to collect information in the instant investigation. In the paragraphs that follow, I have provided an overview of each CHS, to include their basis of knowledge concerning the criminal conduct; motivation to assist the FBI; criminal history; any compensation received from the government; and a statement concerning their reliability.

20.     I have tried to provide sufficient information to the Court, while balancing the anonymity and safety of the various sources.

21.     **CHS-1** is a current and tenured gang member, an experienced drug trafficker and associate of the Target Subjects. CHS-1 has worked with the Target Subjects

---

[1]   The FBI utilizes the term CHS to describe an informant; however, other agencies may use Confidential Source (CS), Confidential Informant (CI), Confidential Witness (CW), or Source of Information (SOI). Herein, I have also used the term CHS to describe a Cooperating Defendant (CD). I believe the various terms are interchangeable, but for the purpose of this affidavit I have only used the term CHS.

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

to distribute controlled substances in the past. CHS-1 has provided assistance in the instant investigation. CHS-1 is motivated to assist the FBI in an effort to reduce gang violence and dangerous drugs in the community. CHS-1 is also motivated by self-preservation. I am unaware of any pending criminal charges against CHS-1. CHS-1 has been convicted of the felony offenses of drug trafficking. CHS-1 has not been paid by the FBI for their cooperation. I believe the information provided by CHS-1 to be reliable because much of it has been corroborated by independent investigation. I am unaware of any false or misleading information that CHS-1 has provided.

22.     **CHS-2** is an intimate associate to one of the Target Subjects and has participated in their drug trafficking operations in the past. CHS-2 was motivated to assist the FBI, in part, because CHS-2 was hoping to stop the flow of narcotics, specifically fentanyl, into the community as they have had family members negatively affected by the drug. CHS-2 was also motivated to assist the government to receive a positive recommendation in a pending felony criminal matter. CHS-2 has been convicted of the felony offense of abuse by a healthcare worker. CHS-2 has not been paid by the FBI for their cooperation. I believe the information provided by CHS-2 to be reliable because much of it has been corroborated by independent investigation. I am unaware of any false or misleading information that CHS-2 has provided.

23.     **CHS-3** is an experienced informant, knowledgeable prior gang member and drug trafficker. CHS-3 has been cooperating with the FBI for approximately seven years and has testified as a government witness in numerous federal jury trials. CHS-3 is a tenured informant who has conducted controlled buys, introduced undercover agents to targets of FBI investigations, worn covert FBI recording devices on the street and in a

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

maximum-security prison facility. CHS-3 does not have any pending charges and has felony convictions for murder, armed robbery, aggravated battery, trafficking a controlled substance, and possession of a controlled substance. CHS-3 has received approximately $17,000 in financial assistance from the FBI. CHS-3 provided assistance in the instant investigation regarding the drug trafficking activities of two of the Target Subjects. I believe the information provided by CHS-3 to be reliable because much of it has been corroborated by independent investigation. I am unaware of any false or misleading information that CHS-3 has provided.

24.      **CHS-4** is an experienced gang member and drug trafficker. CHS-4 has provided considerable assistance in other FBI investigations and assisted the government in several controlled purchases of narcotics. Information provided by CHS-4 resulted in the seizure of controlled substances, firearms, and the arrest of persons being investigated by the FBI. CHS-4 was arrested by the FBI and was motivated to assist the FBI in hopes to receive a positive recommendation in a pending criminal matter. CHS-4 does have a pending criminal charge and has felony convictions for burglary (commercial/automobile), trafficking a controlled substance, possession of a controlled substance, and possession of ammunition by a convicted felon. CHS-4 has received no monetary compensation for their cooperation. I believe the information provided by CHS-4 to be reliable because much of it has been corroborated by independent investigation. I am unaware of any false or misleading information that CHS-4 has provided.

## FACTS ESTABLISHING PROBABLE CAUSE

### JERRY BEZIE, aka: "GIZMO,"

25.      BEZIE is a fentanyl distributor and a TCK gang member who has seven (7)

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

prior arrests for assault upon a police officer; trafficking controlled substances (possession with intent)(within school zone); trafficking controlled substances (possession with intent)(within school zone)-conspiracy; contributing to the delinquency of a minor; trafficking controlled substances (distribution) (narcotic or meth) attempt; trafficking controlled substances (distribution)(narcotic or meth); trafficking controlled substances (possess with intent)(narcotic or meth); receiving stolen property (firearm); criminal damage to property (over $1,000); trafficking controlled substances (distribution) – attempt 2x; receiving stolen property (over $500 but not more than $2,500); use or possession of drug paraphernalia.

26.     BEZIE has two (2) prior felony convictions for trafficking controlled substances (distribution) (narcotic or meth) (1st offense) – attempt, on May 14, 2013, in the Bernalillo County District Court, Case No. D-202-CR-2011-01722 and trafficking controlled substances (possess w/ intent) (narcotic or meth) (1st offense), on May 14, 2013, in case number D-202-CR-2013-02118.

27.     Agents reviewed BEZIE's social media, and observed photographs of expensive jewelry covered in diamonds, including a custom necklace, home renovations, and trips out of state. I have included a few photographs from BEZIE's Facebook account below.

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**



28.     In the above, top left screenshot, BEZIE posted a custom pendant in the shape of the state of New Mexico. On the pendant is the interlocking "TC" logo for the Minnesota, "Twin Cities," baseball team. Based on my experience, TC logo is used by TCK gang members to identify themselves. The remaining photos depict BEZIE's other

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

jewelry and travel.

29.     In December 2022, CHS-1 advised VGTF agents that BEZIE and LEYBA were distributing a significant number of fentanyl pills per week in the Albuquerque area. CHS-1 provided specific details regarding the distribution activities and said both men utilized their cellular telephones to communicate with one another and their drug clients.

30.     In December 2022, agents spoke with CHS-2 who advised they knew BEZIE to sell fentanyl pills and methamphetamine. CHS-2 believed that BEZIE picked up 50,000 pills at a time. CHS-2 advised agents that BEZIE utilized his cell phone to facilitate drug transactions.

31.     In December 2022, VGTF agents conducted surveillance at BEZIE's residence, Subject Premises 1, and observed a vehicle parked in the driveway with the doors and trunk open; there were interior automotive parts on the ground next to the vehicle, which I believe, based on my training and experience to be consistent with hiding contraband inside a vehicle.

32.     In March 2023, CHS-3 advised agents that they knew BEZIE to supply fentanyl pills to several dealers who distributed those pills on Central Ave in Albuquerque. CHS-3 advised that the dealers picked up the drugs from BEZIE at his residence, Subject Premises 1.

33.     CHS-1 and CHS-3 advised that BEZIE possessed large amounts of drug proceeds, fentanyl pills, and firearms. CHS-1 believed that BEZIE currently possessed several thousand fentanyl pills and at least one firearm. CHS-3 believed that BEZIE currently possessed fentanyl pills and firearms at Subject Premises 1.

34.     Within the last two weeks, a person whose identity is known to me but

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

omitted herein and who is unaware of this investigation ("Unwitting") advised CHS-3 that they were supplied with fentanyl pills by BEZIE. Unwitting showed CHS-3 fentanyl pills stamped with a "Versace" symbol and advised CHS-3 that they would further distribute the fentanyl pills. CHS-3 attempted to conduct a controlled purchase of fentanyl pills from BEZIE, thru Unwitting. However, BEZIE was unwilling to meet CHS-3 and would only deal with Unwitting.

35.     According to a review of telephone call data, within the last two months, BEZIE had a significant number of contacts with:

   a.   JG, who was identified as a high-level drug trafficker in Albuquerque during a 2017 FBI investigation. JG has prior arrests for trafficking-controlled substances and possession/manufacture of drug precursors;

   b.   BL, who has prior arrests for possession of a controlled substance and trafficking controlled substances; and

   c.   Target Subject LEYBA.

**JULIAN LEYBA, aka: "RAIL"**

36.     LEYBA is a suspected TCK gang member and fentanyl distributor who has thirteen (13) prior arrests in New Mexico and Arizona for trafficking narcotics; probation violation; conspiracy to traffic controlled substance; possession of a firearm by a felon; tampering with evidence; contributing to the delinquency of a minor 2x; possession of marijuana with intent to distribute; conspiracy to trafficking a controlled substance by distribution; possession of a controlled substance 3x; failure to comply with specific requirements; parole violation; possession of narcotic drug; transport and/or sell narcotic drug; possess narcotic drug for sale; possess/use of drug paraphernalia.

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

37.     LEYBA has three (3) prior felony convictions for trafficking controlled substance (possess with intent to distribute), on January 31, 2005, in the Bernalillo County District Court, Case No. D-202-CR-2004-00856; tampering with evidence, on April 19, 2007, in the Bernalillo County District Court, Case No. D-202-CR-2006-01630; and possession of a controlled substance, on April 1, 2013, in the Bernalillo County District Court, Case No. D-202-CR-2013-01401.

38.     In November 2022, CHS-4 reported to VGTF agents that LEYBA was selling large quantities of fentanyl pills, methamphetamine, and firearms to tenants in the motels located around Coors Boulevard and Iliff Road in Albuquerque. CHS-4 indicated that LEYBA had people at the motels selling narcotics and firearms for him. CHS-4 knew LEYBA to be a convicted felon who had done time in state prison. CHS-4 advised agents that LEYBA used his cellular telephone to conduct drug transactions and communicate with his dealers at the various motels.

39.     In March 2023, CHS-1 and CHS-3 advised agents that LEYBA possessed large amounts of drug proceeds, fentanyl pills, and firearms. CHS-1 believed that LEYBA currently possessed a firearm and fentanyl pills at his residence, although they did not know how many. CHS-3 believed that LEYBA currently possessed fentanyl pills and firearms at his residence.

40.     According to a review of telephone call data, within the last two months, LEYBA had a significant number of contacts with:

   a.   JA, who has prior arrests for possession of controlled substances 3x and trafficking controlled substances 3x;

   b.   AV, who has prior arrests for possession of controlled substances and

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

possession with intent to distribute a controlled substance;

c.  AL, who has prior arrests for possession of controlled substances 3x and possession with intent to distribute methamphetamine; and

d.  Target Subject BEZIE.

<u>Indicia of residence:</u>

**Subject Premises 1**

a.  Subject Premises 1 is the residence of record with the MVD for BEZIE.

b.  The Bernalillo County Assessor's Office list Subject Premises 1 as being owned by BEZIE.

c.  CHS-1, CHS-2, and CHS-3 advised VGTF agents that BEZIE lived at Subject Premises 1.

d.  Over the last several weeks, physical and electronic surveillance has revealed that BEZIE was at Subject Premises 1 most nights.

e.  Over the last week, physical and electronic surveillance has revealed that LEYBA was at Subject Premises 1 approximately three (3) nights.

**Subject Premises 2**

a.  The Bernalillo County Assessor's Office list Subject Premises 2 as being owned by a relative of LEYBA. LEYBA's mother has Subject Premises 2 listed as her residence of record with the MVD.

b.  Over the last several weeks, agents have observed LEYBA driving a silver Chevrolet pickup and have also observed the truck parked in front of Subject Premises 2. The truck is registered to LEYBA's mother, at that address.

c.  Over the last several weeks, physical and electronic surveillance has revealed

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

that LEYBA was at Subject Premises 2 approximately four (4) nights.

## **CONCLUSION**

41.     Based on the information contained herein, I submit there is probable cause for a search warrant authorizing the examination of the Subject Premises described in Attachment A to seek the items described in Attachment B for evidence pertaining to violations of the Target Offenses. This affidavit was reviewed by Assistant United States Attorney Paul Mysliwiec.

Respectfully submitted,

Jordan Spaeth
FBI Special Agent

Subscribed telephonically and sworn electronically March 16, 2023.

HONORABLE KAREN B. MOLZEN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW MEXICO

**ATTACHMENT A**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises 1 is located at **1812 Del Norte Drive SW, Albuquerque, NM 87105,** and may be described as a single-story residence with tan stucco siding, white trim, a flat roof with wood trim, and barred windows and door. The numbers 1812 are posted on the mailbox at the front of the residence next to the road, in front of Subject Premises 1.

Color photographs are attached below.




Surveillance photo                           Google Earth photo

The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel **Jerry BEZIE, aka: "Gizmo,"** or **Julian LEYBA, aka: "Rail,"** to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1.  Any devices found at the premises.

**ATTACHMENT A**
**Person and Premises to be Searched**

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

*KBM*

**ATTACHMENT A**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises 2 is located at **324 General Chennault St NE,**

**Albuquerque, NM 87123**, and may be described as a single story residence with tan stucco siding, a flat

roof, and white trim. The numbers 324 are posted to the left of the front door of Subject Premises 2.

Color photographs are attached below.

 

Surveillance photo                                    Google Earth photo

The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, and

storage containers designated for use by the Subject Premises. The search shall also include vehicles

parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the

Subject Premises. Connection to the Subject Premises may be established by way of prior law

enforcement observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law

enforcement officers are also specifically authorized to compel **Jerry BEZIE, aka: "Gizmo,"** or **Julian**

**LEYBA, aka: "Rail,"** to provide biometric features, including pressing fingers (including thumbs)

against and/or putting a face before the sensor, or any other security feature requiring biometric

recognition, of:

1. Any devices found at the premises.

2. Where the devices are limited to those which are capable of containing and reasonably could

   contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as

**ATTACHMENT A**
**Person and Premises to be Searched**

described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT B**
**Items to be Seized**

**Items to be Seized:** All evidence, fruits, and instrumentalities of violations of: 21 U.S.C. §§ 841(a)(1) and 846 distribution and possession with intent to distribute controlled substances and conspiracy thereto; 18 U.S.C. §§ 922(g)(1) and 924 possession of a firearm and ammunition by a convicted felon; and 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime to include the following:

1. Firearms, firearm parts, magazines, and ammunition;

2. All safes or lock boxes, where evidence of the Target Offenses may be stored for safekeeping against seizure;

3. Controlled substances, drug packaging materials, and paraphernalia;

4. Documents, notes, or writings detailing other individuals involved in the distribution of controlled substances;

5. Large amounts of United States Currency;

6. Cellular telephones;

7. Video surveillance hard drives or storage devices;

8. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys. All documentation, (whether on paper or stored magnetic, digital, or optical media) describing discussions by any individual or entity concerning: the identity of persons that are involved in violations of the Target Offenses;

9. All documents and communications (whether on paper or stored magnetic, digital, or optical media) demonstrating any communication or correspondence with any person or groups of persons involved in violations of the Target Offenses;

10. All evidence related to all off-site storage units, other residences, safety deposit boxes, etc. where evidence of the Target Offenses may be stored for safekeeping against seizure; and

11. All cellular telephone records to establish ownership of the device or the residence.